**EXHIBIT A**

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD

PROFESSIONAL MEDICAL TRANSPORT, INC. )
                                 )

       and                         )       Case Nos.    28-CA-22747
                                   )                              28-CA-22801

INDEPENDENT CERTIFIED EMERGENCY  )
PROFESSIONALS OF ARIZONA, LOCAL #1  )
                                 )
_____ )

## RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

Respondent Professional Medical Transport, Inc., by and through its undersigned attorneys, and pursuant to Section 102.24(b) of the Rules and Regulations of the National Labor Relations Board ("NLRB" or "Board"), hereby moves for summary judgment and dismissal of the Complaint as follows:

## INTRODUCTION AND FACTUAL BACKGROUND

By issuing a Complaint in this matter, Region 28 seeks to impose a union on a group of more than 300 employees who have not chosen that union. Specifically, the Region, by its Complaint, attempts to force Professional Medical Transport, Inc. ("PMT") to bargain with the Independent Certified Emergency Professionals of Arizona, Local No. 1, ("ICEP" or "Union"), despite the Union's lack of majority support. The National Labor Relations Act (the "Act") does not require an employer to bargain with a union that does not have majority support.

In July 2006, PMT voluntarily recognized the Union as the bargaining agent for specified PMT employees. (See Ex. 1 at ¶ 2). Respondent recognized the Union despite the Union's failure to provide any evidence of majority status. (Id. at ¶ 3). In the years since PMT recognized the Union as bargaining agent, the ICEP has never provided PMT with any evidence of majority

status. (Id. at ¶ 4). On February 11, 2009, when PMT asked the ICEP President whether he had majority support, he refused to answer and left negotiations. (Id. at ¶ 5). Since that time, the Union has still failed and refused to provide PMT with any evidence that the Union has, at any time, enjoyed the support of a majority of bargaining unit members. (Id. at ¶ 6).

The only evidence of Union support is unlawful dues authorizations, which never exceeded 1/3 of the employees in the unit when the unit was only around 160 employees. (*See* Affidavit of James Cunningham dated February 16, 2009, attached hereto as Exhibit 2). The Unit has grown from 171 in July 2006 to over 400 today, with no corresponding increase in the number of dues authorizations. Mr. James Cunningham, an original Trustee of the Union, averred that the Union never had any documentation of majority support, only the dues authorizations from a minority of the employees in the unit. (See Exhibit 2 at ¶ 5). Mr. Cunningham further averred that the existence of a majority was never discussed among the Union. (See Exhibit 2 at ¶ 6).

Despite the continuous lack of any evidence of majority support, the Region relies on a presumption which purports to require an employer to bargain with a union that has never shown majority status. In the Region's view, despite evidence that the union does not now enjoy and never has obtained majority status, Respondent still must engage in bargaining that is clearly *prohibited* by the Act. The Region fails to recognize that federal courts and the Board have held otherwise. The policies of the Act, and the principles of fairness that underlie the Board's rules, cannot be construed to impose liability on Respondent for any alleged unfair labor practice activity, where the Union does not enjoy majority support.

The allegations of unilateral change and bad faith bargaining depend on the existence of a valid collective bargaining relationship. No such predicate exists here. Accordingly, the

2

complaint should be dismissed as to those allegations that require a valid collective bargaining relationship.[1]

## LEGAL ARGUMENT

**I.      Summary Judgment Standard**

Summary judgment is appropriate in unfair labor practice proceedings where no material factual issue exists. *National Labor Relations Bd. v. W.S. Hatch Co.*, 474 F.2d 558 (9th Cir. 1973); *National Labor Relations Bd. v. Union Bros., Inc.*, 403 F.2d 883 (4th Cir. 1968).   In response to a Motion for Summary Judgment, Counsel for the General Counsel ("CGC") may not rest upon the pleadings, but must present specific facts which demonstrate that there are material facts requiring a hearing.  *Chicago Health and Tennis Clubs, Inc.*, 226 NLRB 1202 (1976), *enforced*, 567 F.2d 331 (7th Cir. 1977), *cert denied.*, 437 U.S. 904 (1978). Summary Judgment is appropriate here because it is undisputed that the Union never provided Respondent with evidence of majority support. Accordingly, Respondent's recognition of the Union was invalid.

**II.     The Region cannot establish majority support of the Union in a proper unit**

Here, among the background allegations, the Complaint alleges, and the Answer denies:

- The following employees of the Respondent, herein called the Unit, constitute an appropriate unit for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

  All full-time and regular part-time field paramedics, EMTs, IEMT's, and registered nurses, but excluding administrative staff individuals, support services, personnel not directly operating in the field as an EMS provider, guards, office clerical, and supervisors as defined under the Act. (Complaint, Ex.3 hereto, at ¶ 5(a).)

---

[1] Specifically, Paragraphs 7 and 8 of the Complaint, including all subparagraphs, should be dismissed.

3

- Since in or about July 7, 2006, and at all material times, the Union has been the designated exclusive collective-bargaining representative of the Unit and since then the Union has been recognized as the representative by the Respondent. This recognition has been embodied in a recognition agreement dated July 7, 2006. (Complaint at ¶ 5(b).)

- At all times since July 7, 2006, based on Section 9(a) of the Act, the Union has been the exclusive collective-bargaining representative of the Unit. (Complaint at ¶ 5(c).)

It is indisputable that the Board never certified this Union as the Section 9(a) collective bargaining representative of the Unit. Instead, the Complaint rests entirely on the Respondent's unlawful voluntary recognition of a minority Union as the collective bargaining representative in July 2006. (Complaint at ¶ 5(b).) It is the CGC's burden to show that the voluntary recognition resulted in the Union having 9(a) status. As set forth below, the CGC cannot meet this burden.

Additionally, the unit alleged in the Complaint differs from the unit that PMT unlawfully recognized in July 2006. (Compare, Complaint at ¶ 5(a) and July 7, 2006 recognition letter, Ex. 4 hereto.) Yet, the CGC's Complaint still relies on the July 2006 recognition letter in its allegation that the Union is and has been the exclusive collective-bargaining representative. (Complaint at ¶ 5(b).) CGC's act of alleging a unit that differs from that originally, and unlawfully, recognized by Respondent is inappropriate.

Further, in an earlier case involving these same parties, the CGC alleged the unit described above and argued that it was the appropriate unit. The administrative law judge found that the unit recognized in the July 2006 letter was an appropriate historical unit, despite the CGC's attempt to define the unit differently. (See, ALJ Kocol's decision in 28-CA-22175, attached, in relevant part as Ex. 5 at 15:48-16:5.) Despite the ALJ's decision, the CGC, once again, improperly alleges a unit different from the unit originally recognized by the parties. The CGC's Complaint, without explanation, relies on the July 2006 recognition letter, yet at the same

4

time, alleges a unit different from that set forth in the July 2006 letter. Accordingly, the unit alleged in the Complaint is not an appropriate bargaining unit in these circumstances. The NLRB has no statutory authority to find that the Company committed an unfair labor practice under Section 8(a)(1) and Section 8(a)(5) of the Act absent an appropriate unit determination under Section 9(d) of the Act. *Cardox Division of Chemetron Corp.*, 699 F.2d 148 (3rd Cir. 1983), and *Memorial Hospital of Roxsborough v. NLRB*, 545 F.2d 351 (3rd Cir. 1976).

(i)     ***Voluntary Recognition is valid only where there is a contemporaneous showing of majority support***

An employer is obligated under Section 8(a)(5) to bargain collectively with a union that has been "designated and selected for the purposes of collective bargaining by the majority of employees," pursuant to Section 9(a) of the Act, 29 U.S.C. § 159(a).  In the usual case it is an unfair labor practice under Section 8(a)(1) and (2) for an employer to engage in collective bargaining when only a minority of employees has "designated and selected" the union as its bargaining representative. *See, NLRB v. Local 103, Intern. Ass'n of Bridge, Structural and Ornamental Iron Workers (Higdon)*, 434 U.S. 335, 344, 98 S.Ct. 651 (1978) ("There could be no clearer abridgment of § 7 of the Act, assuring employees the right 'to bargain collectively through representatives of their own choosing' or 'to refrain from' such activity than to grant exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority." (internal quotations and citation omitted)).

In *International Ladies' Garment Workers' Union, AFL-CIO v. NLRB*, 366 U.S. 731 (1961), the United States Supreme Court ruled that apart from a Board-certified election, an employer and union may establish a Section 9(a) relationship through the employer's voluntary recognition based upon an actual showing that the union in fact has the support of a majority of

5

employees. In *Garment Workers,* the employer and union signed a memorandum of understanding in which the employer recognized the union as the "exclusive bargaining representative" of its employees. The employer, without verification, accepted the union's oral assertion that it possessed union authorization cards signed by a majority of employees when in fact the union did not enjoy the support of a majority of employees. Two months after signing the memorandum of understanding, the employer and union executed a collective bargaining agreement which embodied the recognition terms of the memorandum. When the parties executed the CBA the union did, in fact, enjoy majority support.  The Board and the District of Columbia Circuit Court concluded that the parties had unlawfully entered into a Section 9(a) majority supported bargaining relationship because the union lacked majority support when the parties signed the memorandum of understanding and, therefore, the memorandum of understanding and collective bargaining agreement were unlawful. *See, International Ladies' Garment Workers' Union v. NLRB,* 280 F.2d 616 (D.C. Cir. 1960); and *Garment Workers, ILGWU (Bernhard-Altmann Texas Corp.),* 122 NLRB 1289 (1959).

The Supreme Court granted certiorari and  focused on employee rights as guaranteed by Section 7 of the Act. The Supreme Court agreed with the District of Columbia Circuit Court, stating: "[The employer] granted exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority." *Garment Workers,* 366 U.S. at 737.

Accordingly, in *Garment Workers,* the Supreme Court affirmed as a general rule that an employer's voluntary recognition of a union as a Section 9(a) representative first requires that the union in fact enjoy the support of a majority of employees. Therefore, under Supreme Court law a voluntary recognition without the requisite showing of majority support is invalid.

PHOENIX \ 678742.1 \ 087465.002

This holding has been reaffirmed by the circuit courts. For example, in *Georgetown Hotel v. NLRB,* 835 F.2d 1467, 1470-72 (D.C. Cir. 1987), the D.C. Circuit held that "voluntary recognition has been found to have occurred when an employer agrees to recognize a union through a card check or some other procedure and then subsequently confirms the union's majority status through that procedure." The court reversed the Board's finding of a Section 9(a) relationship, stated "in this case, the Board is unable to point to any evidence in the record to suggest that verification, the critical prerequisite to recognition, ever occurred." *Id.*

Additionally, NLRB law is clear that any voluntary recognition, whether it be through contract language, card checks, conduct, or otherwise, is dependent on a recognition and request by the union on a confirmation of the union's majority status. The Board in *McLaren Health Care Corp.* 333 NLRB 256, 258 (2001) stated,

> . . . voluntary recognition has been found to have occurred when an employer agrees to recognize a union through a card check or some other procedure and subsequently confirms the union's majority status through that procedure. The Board and the courts have refused to find that a binding recognition agreement exists unless both of those requirements are satisfied.

Thus, the law requires: 1.) a procedure for checking majority status and; 2.) a confirmation of majority status through that procedure. *Id.* This conclusion is consistent with the Board's General Counsel's advice on the subject, which stated:

> [e]ven if the union does, in fact, represent a majority of the Employer's employees, ... there must be explicit proof presented contemporaneously with the Union's demand and the Employer's voluntary recognition. Thus, although the Employer's ambiguous statements arguably may indicate that it believed the Union had majority support, those statements are insufficient to confer 9(a) status upon the Union without actual demonstration of that majority status.

Advice Ltr. from NLRB Gen. Counsel to Regional Director of Region 9, Feb. 27, 1989, 1989 WL 241614, at *2. (Feb. 27, 1989) (emphasis added).

7

In the matter at hand, there has ever been a card check, petition, or election. Majority status has never been confirmed or checked despite PMT's continued denial that the Union ever has had majority support. The voluntary recognition given in July 2006 was invalid and the General Counsel cannot carry its burden of establishing two fundamental bases of the Complaint; namely, that the unit alleged in the Complaint is an appropriate unit and that the Union has majority support and therefore a Section 9(a) bargaining relationship exists.

Majority status is at the heart of the Act. As Senator Wagner declared in his support of the bill which became the foundation of the Act: "[C]ollective bargaining can be really effective only when workers are sufficiently solidified in their interests to make an agreement covering all. This is possible only by means of majority rule." *Hearings on S. 1958 before the Senate Comm. on Education and Labor,* 74th Cong., 1st Sess. (1935), reprinted in *1 Leg. Hist. of the National Labor Relations Act, 1935,* at 1419 (1949).

As an alternative to actual evidence, the Region relies on the fiction of a voluntary recognition letter to find majority support. This action purports to force Section 9(a) recognition on PMT and its employees when there has never been a showing that majority of PMT employees desire Union representation. This finding denies the employees their free choice protected by Section 7 [29 U.S.C. § 157] of the Act, imposes an ineffective minority union on the employees, and is in error.

> (ii)    ***There has been no subsequent obtaining of majority status and any claim to the contrary is tainted by the original unlawful recognition.***

As outlined above, PMT's original recognition of the Union was unlawful as there was no contemporaneous showing of majority status. Because the recognition was unlawful, even if the Union subsequently gained majority support, which it has not, the majority status would be tainted and the Union would still not be a valid bargaining agent.

8

In *International Ladies' Garment Workers' Union, AFL-CIO v. NLRB*, 366 U.S. 731, 736

(1961), the Supreme Court reasoned that even if a union subsequently gains majority support, an

employer's initial unlawful grant of recognition would taint that majority. The Court reasoned:

> "[W]e reject as without relevance to our decision the fact that, as
> of the execution date of the formal agreement on October 10,
> petitioner represented a majority of the employees. As the Court of
> Appeals indicated, the recognition of the minority union on August
> 30, 1957, was 'a fait accompli depriving the majority of the
> employees of their guaranteed right to choose their own
> representative.' 280 F.2d at page 621. It is, therefore, of no
> consequence that petitioner may have acquired by October 10 the
> necessary majority if, during the interim, it was acting unlawfully.
> Indeed, such acquisition of majority status itself might indicate that
> the recognition secured by the August 30 agreement afforded
> petitioner a deceptive cloak of authority with which to persuasively
> elicit additional employee support.

*Id.* (standing for the proposition that the initial illegal recognition tainted all that followed so that

the fact that the Union gained majority status prior to the execution of a collective bargaining

agreement is immaterial); *See also, R. J. E. Leasing Corp.*, 262 NLRB 373, 380 (1982)(same).

Accordingly, under both NLRB law and Supreme Court precedent, PMT's original unlawful

recognition of the Union, granted without a showing of majority, taints any subsequent finding of

majority status.

        **(iii)**    ***Section 10(b) of the NLRA does not preclude PMT from challenging majority status***

CGC may contend that PMT is barred by the Act's six (6) month limitation period in

Section 10(b) [29 U.S.C. § 160(b)] from challenging whether the Union enjoyed the support of a

majority of employees. In other words, Respondent anticipates that CGC will argue that once six

(6) months have passed from the time of a voluntary recognition, an employer is barred from

challenging majority status at the time of recognition. The Act does not compel such a result.

The National Labor Relations Board is entirely a creature of statute. As such, the Board

can only exercise the authority given by Congress in the Taft-Hartley Act or Labor Management

Relations Act of 1947 ("LMRA"), 29 U.S.C. § 141, et seq. Section 10(b) states in relevant part: "[No] complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made." This six(6) month limitation of Section 10(b) by its express terms only applies to the <u>Board's own issuance of complaints</u>. As noted by the Fourth Circuit Court of Appeals, "it is not immediately clear to us that the Board's rule applying the 10(b) time-bar to nonconstruction industry employer defenses of invalid voluntary recognition is a reasonable construction of a provision that, on its face, only applies to complaints filed by the Board." *American Automatic Sprinkler Systems, Inc. v. NLRB,* 163 F.3d 209, 219 (4th Cir. 1998). Thus, Section 10(b) cannot be applied to bar PMT's defense of the Union's lack of majority support.

When construing a statute, a court's task is to give effect to the will of Congress. If the will of Congress has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive. *Negonsott v. Samuels,* 507 U.S. 99, 104 (1993). Courts should give the words in statutes their plain meaning. *See, Williams v. Taylor,* 529 U.S. 420, 431 (2000) ("We give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import."). If the statutory language is clear and unambiguous, the court's inquiry ends there. *See, Caminetti v. United States,* 224 U.S. 470, 485 (1917).

Here, the plain language of Section 10(b) provides that "no complaint" shall issue based on an unfair labor practice occurring more than six months prior. There is no indication in the text that this limitations period was meant to apply to anything other than <u>complaints issued by</u>

the Board. Accordingly, to apply the 10(b) limitations period to confer majority status on a minority union is inappropriate and not supported by the plain language of Section 10(b).

Moreover, to apply Section 10(b) to this situation is inconsistent with *Garment Workers, supra,* in which the Supreme Court permitted inquiry into whether the union actually had majority support at the time the parties allegedly established a Section 9(a) relationship. Based on the foregoing, application of Section 10(b) time limits to Respondent's voluntary and unlawful recognition is inconsistent with the plain language of Section 10(b) and United States Supreme Court precedent. Moreover, the concept limits employees' Section 7 [29 U.S.C. § 157] rights to choose or refrain from union representation under Section 9(a). Accordingly, PMT'S original unlawful recognition of the union is still unlawful, despite the Union's fortuity that more than six (6) months have passed since the time of recognition.

     **(iv)**    ***The D.C. Circuit has rejected the presumption of majority status in similar situations***

Importantly, the presumption that a voluntary recognition may not be challenged after 6 months have passed from the time of recognition was rejected by the D.C. Circuit in *Nova Plumbing v NLRB,* 330 F.3d 531 (D.C. Cir. 2003).[2] In *Nova Plumbing,* the D.C. Circuit Court of Appeals refused to enforce a Board order requiring a construction industry employer to bargain with a union under Section 9(a) despite the parties' clear and unambiguous contract language recognizing the union as a majority representative. The Court refused enforcement because there was no actual showing that a majority of the affected employees supported the union.

---

[2] A federal circuit court decision which has not been overturned by the Supreme Court represents the highest law or statutory interpretation available in that circuit, and is binding on administrative agencies such as the NLRB, which do not have the same authority as these courts. *Allegheny General Hosp. v. NLRB,* 608 F.2d 965 (3d Cir. 1979), *overruled on other grounds by, St. Margaret Memorial Hosp. v. NLRB,* 991 F.2d 1146, 1152 (3d Cir. 1993).

11

The union in *Nova Plumbing* threatened litigation if the company refused to recognize and bargain with the union. The employer initially responded by petitioning for a Board-sponsored election. The company, however, later withdrew its petition and signed a two-year agreement with the union to resolve their dispute. That agreement required Nova Plumbing to recognize the union as the majority representative of its employees. *Id.* at 535. Notwithstanding the contract's language, there was no evidence of majority support among the employees. *Id.* The employer bargained with the union briefly, but broke off negotiations, contending, in direct contradiction to the agreement it had signed, that it had a Section 8(f) relationship and that it was permitted to walk away from its bargaining obligations after the agreement expired. *Id.* The Board rejected the employer's position and held that the agreement created a Section 9(a) relationship. The employer sought judicial review of the Board's order. It argued that the Board's order was unenforceable because there was no actual majority support for the union among its employees. The D.C. Circuit Court agreed, finding that the Board had impermissibly sanctioned a Section 9(a) relationship in the absence of an actual showing of majority support. *Id.* at 536-39.

The D.C. Circuit *rejected* the Board's rule that permits the creation of a Section 9(a) relationship based on contract language and the parties' intent.

> The proposition that contract language standing alone can establish the existence of a Section 9(a) relationship runs roughshod over the principles established in *Garment Workers*, for it completely fails to account for employee rights under Sections 7 and 8(f). An agreement between an employer and union is void and unenforceable, *Garment Workers* holds, if it purports to recognize a union that actually lacks majority support as the employees' exclusive representative.
>
> ...
>
> By focusing exclusively on employer and union intent, the Board has neglected its fundamental obligation to protect employee Section 7 rights, opening the door to even more egregious violations than the good faith mistake at issue in *Garment Workers.*

PHOENIX \ 678742.1 \ 087465.002

*Id.* at 536-37 (emphasis added).

In the present case, as in *Nova Plumbing*, the Region attempts to force a Section 9(a) bargaining relationship on employees, without a showing that a majority of these employees ever supported the Union. Again, to be lawful, voluntary recognition must be based on a clear showing of majority support among the unit employees. *Nova Plumbing*, 330 F.3d at 536 ("Absent a Board-conducted election, the Board required proof of 'a union's express demand for, and an employer's voluntary grant of recognition to the union as bargaining representative based on a contemporaneous showing of union support among a majority of the employees in an appropriate unit.'") (quoting *J&R Tile, Inc.,* 291 NLRB 1034, 1037 (1988)). Here, there has never been a showing of majority support. Thus, the *Nova Plumbing* rationale should apply and there should be no presumption of majority support.

## CONCLUSION

The proposition that a voluntary recognition letter standing alone can establish the existence of a section 9(a) relationship contradicts the principles established in *Garment Workers, supra,* and fails to account for employees' right to representatives of their own choosing. The Board and courts "have never included a preference for imposing a collective bargaining representative upon those who have not affirmatively chosen that representative by election." *Be-Lo Stores v. NLRB,* 126 F.3d 268, 272 (4th Cir. 1997). Consistent with the NLRA's mandate to protect employee Section 7 rights to choose their own bargaining representatives, the law requires an actual showing of majority support before imposing a Section 9(a) relationship on employees based on the agreement between an employer and a union. *Nova Plumbing,* 330 F.3d at 534.

13

Section 9 (a) of the Act and its imperative of a majority-designated collective bargaining agent must be the touchstone of the analysis. The Board itself in *Gourmet Foods,* 270 NLRB 578, 584 (1984) recognized that: "The principle of majority rule is written into Section 9(a) of the National Labor Relations Act...It is this standard of majority rule that enables the Act's policies ....For it is the culmination of choice by a majority of employees that leads to the process of collective bargaining." *Id.* (refusing to issue bargaining order absent proof of Union's majority status).

Here, the Union has never had the support of a majority of bargaining unit employees. Accordingly, for all of the foregoing reasons, Respondent is entitled to judgment as a matter of law and the allegations in the Complaint that require a valid collective bargaining relationship should be dismissed without a hearing before an administrative law judge. By asserting only the grounds set forth in this Motion, Respondent does waive any of its substantive defenses to the Complaint or any other basis for summary dismissal of this matter.

DATED this 30th day of March 2010.

SHERMAN & HOWARD L.L.C.

Robert J. Deeny
Michael C. Grubbs
2800 N. Central Avenue, Suite 1100
Phoenix, AZ 85004
Attorneys for Professional Medical
Transport, Inc.

14

I certify that I caused a copy of the foregoing
Motion for Summary Judgment to be electronically filed this 30th day of
March, 2010, and that a

**COPY** of the foregoing was sent via
email this 30th day of March, 2010, to:

Cornele A. Overstreet
Regional Director, Region 28
NATIONAL LABOR RELATIONS BOARD
2600 N. Central Avenue, Suite 1800
Phoenix, AZ  85004-3099
cornele.overstreet@nlrb.gov

Sandra L. Lyons
Field Attorney, Region 28
NATIONAL LABOR RELATIONS BOARD
2600 N. Central Avenue, Suite 1800
Phoenix, AZ  85004-3099
Sandra.Lyons@nlrb.gov

Joshua S. Barkley
Independent Certified Emergency
Professionals of Arizona, Local #1
11417 E. Decatur Street
Mesa, AZ  85207
coachjbar@yahoo.com

By

15

**EXHIBIT B**

## DECLARATION OF JAMES ROEDER

**JAMES ROEDER**, under penalty of perjury, states as follows:

1. I am now and have been the Vice President of Clinical Services for Professional Medical Transport, Inc. ("PMT") since 2005. I make this declaration based upon my personal knowledge on behalf of PMT, with authorization to do so in my present capacity as Vice President of Clinical Services.

2. PMT is a respondent in the U.S. District Court of Arizona Case encaptioned, *National Labor Relations Board v. Professional Medical Transport, Inc., et. al.*, Case No 2:10-mc-0061 (the "District Court action").

3. PMT is also a party in an action before the U.S. National Labor Relations Board entitled *Professional Medical Transport Inc., et. al.*, Cases 28-CA-22747, 28-CA-22801, 28-CA-22993, and 28-CA-23022 (the "NLRB action"), out of which the District Court action arises.

4. This declaration relates to PMT's opposition to the subpoena enforcement action brought by NLRB in the District Court.

5. PMT is an Arizona corporation with its principal place of business in Tempe, Arizona and has emergency service contracts with the cities of Scottsdale, Paradise Valley, Tempe, Chandler, and Guadalupe.

6. Mr. Bob Ramsey is one of the shareholders of PMT and has been since 2005.

7. The Union and PMT began a bargaining relationship in July 2006. The parties entered into a "Letter of Acceptance" recognizing the Union as the bargaining agent for "any full time field paramedics, EMT's, IEMT's, and registered nurses" at PMT. Mr. Joshua Barkley, a PMT employee and the President of the ICEP, signed on behalf of the Union. Between September 2007 and February 2009, PMT and the Union engaged in negotiations for a collective bargaining agreement.

8. In early 2009, the Union filed several unfair labor practice charges against PMT. The charges alleged: that PMT interfered with, restrained, or coerced employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act; PMT discriminated in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; and PMT did not fail and refuse to bargain collectively and in good faith with the Union.

9.    In July 2009, a hearing was held on the alleged unfair labor practices. Administrative Law Judge Kocol dismissed many of the allegations against PMT, including the allegation of bad faith bargaining. PMT has appealed to the NLRB Judge Kocol's decision finding that PMT engaged in unfair labor practices. That appeal is still pending.

10.   Throughout the past two years, the NLRB has sought to impose a union on a group of nearly 200 PMT employees who have not chosen that union.

11.   For the last two years The NLRB has continually attempted to force PMT to recognize and bargain with the Independent Certified Emergency Professionals of Arizona, Local No. 1, ("ICEP" or "Union"), despite the Union's lack of majority support.

12.   For nearly two years, PMT has requested the Union for some evidence of majority status, which has yet to be provided by the Union. ). On February 11, 2009, when PMT asked the ICEP President at negotiations whether he had majority support, Mr. Barkley refused to answer and left negotiations. I was present at the negotiations and witnessed Mr. Barkley's refusal to answer and his departure from the negotiations.

13.   The Union's President, Mr. Joshua Barkley, agreed, in April 2010 on a telephone call with Administrative Law Judge John McCarrick, to a neutral third-party card check of the ICEP's authorization cards as of the time of recognition. However, he has since refused PMT's subsequent offers to set up this neutral card check.

14.   The NLRB alleges, among other things, in its most recent complaint against PMT that PMT and American ComTrans Ambulance Service, Inc. ("ComTrans") are labor law "alter egos" and that ComTrans was established by PMT as a disguised continuation of PMT in March 2008.

15.   On April 28, 2010, PMT received an initial subpoena duces tecum from the NLRB in the NLRB action, which sought documents responsive to 23 separate requests. PMT timely responded to all 23 requests.

16.   The second subpoena duces tecum to PMT, dated May 10, 2010, for which the NLRB seeks enforcement, asks for 50 separate categories of documents. Of those categories, PMT has provided responses to at least 34. Thus, all told, PMT has provided responsive documents (or indicated that no responsive documents exist) to 57 of the 73 total categories of requests.

2

17.    In total, PMT has provided, to date, approximately 3500 pages of documents to the NLRB in relation to the underlying complaint and continues to update its subpoena responses. Documents with Bates ranges PMT2 0001-PMT2 2883 were delivered to the NLRB's offices. Additionally, two binders with approximately 700 pages of documents were given to the NLRB at the hearing on June 8, 2010.

18.    As for requests 2, 4, 5, 18, 36, 39, and 41, responsive documents have been provided to the NLRB and PMT will continue to supplement its responses to those requests.

19.    As for requests 9, 13, 17, and 22, PMT has indicated that no such documents exist.

20.    PMT is willing to provide and is in the process of locating and reviewing documents, if any, responsive to requests 15, 16, 20, and 21 and these will be provided to the NLRB as soon as they are located and reviewed.

21.    There are just thirteen categories of documents in dispute before the Court in this enforcement proceeding - requests 6, 7, 8, 9, 10, 11, 12, 19, 24, 25, 26, 27, and 38.

22.    All of the information sought by the SDT in requests numbers 10, 11, 19, and 24 is irrelevant and outside the scope of the underlying charges in the NLRB action.

23.    In response to Request 10, PMT has provided a list of employees who are part of the alleged bargaining unit.

24.    Request 11 seeks information on employees outside of the bargaining unit.

25.    The information sought in Request 19 is not relevant to the allegations in the underlying Complaint because it is not related to the allegations or issues in the Complaint.

26.    Request 24 seeks information on businesses that are not even included in the underlying Complaint.

27.    Requests 8 and 14 would require manual review of PMT's invoices since January 2009 in order to protect and redact confidential patient information. PMT has performed tens of thousands of transports in that time period. It would require hundreds of hours of time to gather and review the documents.

28.    Request 38 of the SDT is unduly burdensome because gathering and reviewing the documents requested by the SDT would be an enormous undertaking and create serious difficulties for PMT. The information requested would require individualized review of hundreds of personnel files to determine who was

3

terminated and for what reason. This would cause days of disruption to the normal business duties of PMT's human resources personnel.

29. Request 6, 7, 8, 12, and 27 seek disclosure of confidential business information.

30. The customer data sought by the NLRB for the period from January 2009 to the present contains competitively sensitive information. The information sought in Request 27 includes the identification of PMT's clientele, which information PMT considers and treats as confidential, proprietary, and commercially sensitive. PMT does not share, disclose, or provide access to this information to the public, its customers, its competitors, or the Union.

31. Public disclosure of the information sought in Request 27 would create a risk of significant injury to PMT because PMT's competitors would be able to use such information, to which they would not otherwise have access, to compete for PMT's existing and prospective customers.

32. Request 6, 7, 8, and 12 seek information on the detailed financial status of PMT, which contains competitively sensitive financial information.

33. By comparing the agreements, financial documents, and leases sought by Requests 6, 7,8, and 12, competitors could discern PMT's internal pricing and profit margins.

34. PMT considers and treats the information sought by the NLRB in Requests 6, 7, 8, and 12 as confidential, proprietary, and commercially sensitive. Only employees, such as high level managers, have access to this information.

35. PMT does not share the information sought by the NLRB in Requests 6, 7, 8, and 12 or provide this information to the public, its customers, its competitors, or the Union.

36. Public Disclosure of the information sought by the NLRB in Requests 6, 7, 8, and 12 would create a risk of significant competitive injury to PMT. For example, competitors could use this information, to which they would not otherwise have access, to compete for PMT's customers with an unfair advantage by knowing PMT's internal pricing and profit margins.

37. Much of the information sought by the NLRB in  Requests 6, 7, 8, 12 and 27 would cause harm to PMT's business if it were to become available to PMT's competitors. In fact, one of PMT's competitors, Southwest Ambulance, had a representative at the hearing in the NLRB action that was held in June, presumably

for the sole purpose of attempting to acquire confidential information. I was present at that hearing on June 7 and 8, 2010. and recognized the competitor from Southwest.

38.   Ambulance service in Maricopa county is an extremely competitive business with profit margins of 5% or less. If specific customer lists became public information, PMT's competitors would be able to target their marketing efforts to PMT's customers and that would cause significant damage to PMT.

39.   One illustration of this competitive environment happened when PMT's competitor became aware of PMT's intention to market a pediatric facility with a specialty equipped ambulance. The competitor then immediately put a similar unit in service before the vehicle PMT ordered for this project arrived. For those types of reasons, PMT's confidential information merits protection.

40.   Because ambulances do not operate on a route system, PMT cannot respond to Requests 25 and 26. Ambulances respond to emergencies, and do not follow a set route as would a delivery truck, etc.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

    Executed: July 15, 2010.

    JAMES ROEDER

**EXHIBIT C**

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | | |
|---|---|---|
| PROFESSIONAL MEDICAL TRANSPORT, INC. ) | | |
| ) | | |
| and ) | Case Nos. | 28-CA-22747 |
| ) | | 28-CA-22801 |
| PROFESSIONAL MEDICAL TRANSPORT, INC. ) | | 28-CA-22993 |
| and its alter ego AMERICAN COMTRANS ) | | 28-CA-23022 |
| AMBULANCE SERVICE, INC. ) | | |
| ) | | |
| and ) | | |
| ) | | |
| INDEPENDENT CERTIFIED EMERGENCY ) | | |
| PROFESSIONALS OF ARIZONA, LOCAL #1 ) | | |
| ) | | |
| —————————————————————————— ) | | |

## RESPONDENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Respondent Professional Medical Transport, Inc., by and through its undersigned

attorneys, and pursuant to Section 102.24(b) of the Rules and Regulations of the National Labor

Relations Board ("NLRB" or "Board"), hereby moves for partial summary judgment and

dismissal of the Complaint as follows:

### I.      INTRODUCTION

The primary claims in this case are against Professional Medical Transport, Inc.

("PMT"). However,  the Second Consolidated Complaint contains allegations that  PMT and

ComTrans are alter egos and that ComTrans was established by PMT as a disguised continuation

of PMT in March 2008. (See Second Consolidated Complaint at ¶ 2(h)).  Further, the Complaint

alleges that PMT established ComTrans in order to evade its responsibilities under the Act.

(Complaint at ¶ 2(i)). Finally, the Complaint alleges that PMT has transferred unit work to

ComTrans since November 2009. (Complaint at ¶ 7(a)). The allegations regarding alter ego

status are reckless, improper and in direct contradiction of the facts that have already been

provided to the Region by way of Respondent PMT's position statement. For the reasons outlined below, Respondent is entitled to summary judgment on the claims alleging that PMT and ComTrans are alter egos.

## II.    FACTS

ComTrans was granted its first Certificate of Necessity under the name Terros Ambulance Service on April 30, 1985. Its ownership was transferred and its name changed to ComTrans Ambulance Service on September 20, 2000. (See Ex. 1 hereto).   ComTrans' ownership was then transferred to the current owner, StarWest, which is owned by Bob Ramsey, on May 23, 2003. (See Affidavit of Jim Roeder, attached hereto as Ex. 2 at ¶ 2). Thus, ComTrans has been in existence and under the same ownership since May 2003. PMT, on the other hand, has been owned by Bob Ramsey and Pat Cantelme since August 2005. (Ex. 2 at ¶ 3).

ComTrans's operations managers are as follows:

- Ralph Vassallo      Chief Executive Officer

PMT's operations managers are as follows:

- Pat Cantelme        Chief Executive officer/911 Operations Manager

- Beverly Lemoine     911 City Manager

- Barbie Marr         911 City Manager

- Gary Ramsey         Senior Vice President

- Kellie O'Connor     Director of Quality Assurance/Staffing

- Jim Roeder          Vice president of Clinical Services

(Ex. 2 at ¶ 4).

2

ComTrans's service area consists of all of Maricopa County. (Ex. 2 at ¶ 5). PMT's service area consists generally of Maricopa County east of Peoria's western city limits and south of Phoenix northern city limits. (Ex. 2 at ¶ 6).

ComTrans Certificate of Necessity (C.O.N.) is limited to behavioral health situations. (Ex. 2 at ¶ 7). ComTrans is excluded from 911 contracts by its C.O.N. (*Id.*). PMT has an unlimited Certificate of Necessity. (Ex. 2 at ¶ 8). PMT is able to do both 911 calls and inter-facility transfers. (*Id*). PMT has 911 contracts with Scottsdale, Paradise Valley, Tempe, Chandler, and Guadalupe. (Ex. 2 at ¶ 9).

ComTrans's primary customers are Hospice of the Valley and Behavioral Health Crisis Center. (Ex. 2 at ¶ 10). PMT has multiple inter-facility contracts, including Banner Health and Catholic Healthcare West. (Ex. 2 at ¶ 11). PMT does not contract with Hospice of the Valley or Behavioral Health Crisis Center. (*Id.*).

ComTrans has unique medicare and Arizona Health Care Cost Containment System (AHCCCS) provider numbers. PMT also has unique Medicare and AHCCCS provider numbers which are different that those held by ComTrans. (Ex. 2 at ¶ 12).

PMT is a member of the Phoenix Uniform Rate Group under the Arizona Department of Health Services regulated rate system. This rate group is made up of all the unrestricted C.O.N. holders in the metropolitan Phoenix area and all have the same rate structure. ComTrans has a restricted C.O.N. and therefore is not allowed to be a part of this rate group. As a result, the Arizona Department of Health Services approved rates that ComTrans is allowed to charge are different and less than those of the Phoenix Uniform Rate Group. (Ex. 2 at ¶ 13).

ComTrans's rates are: Advanced Life Support ("ALS") Base Rate $636.11, Basic Life Support ("BLS") Base Rate $566.32, Mileage $14.32 per loaded mile. PMT rates are: ALS

3

Base Rate $710.57, BLS Base Rate $632.96, Mileage $14.73. Each company may charge the manufacturer's suggested retail price for supplies. Assuming a fairly typical transport of an ALS patient with $100 in disposable supplies transported 7 miles, the resulting bill for ComTrans would be $836.35. If the same transport occurred with PMT the resulting bill would be $913.68. Therefore, diverting a call from PMT to ComTrans would result in a loss of $77.33 or 8.5% in this hypothetical scenario. (Ex. 2 at ¶ 14).

ComTrans's operational headquarters are at 5424 S. 40th Street in Phoenix, Arizona. (Ex. 2 at ¶ 15). PMT's operational headquarters are located at 2495 S. Industrial Park Avenue in Tempe, Arizona. (Ex. 2 at ¶ 16).

ComTrans uses only contract employees for its operations. ComTrans has contracted with ComTrans, Inc., Lifestar EMS, and PMT. (Ex. 2 at ¶ 17). PMT has direct employees and staffs most of its positions with full-time employees. (Ex. 2 at ¶ 18). The equipment used by PMT and ComTrans is separate. While both ComTrans and PMT use ambulances to deliver the services they provide, each ambulance is, by statute, required to be registered with the Arizona Department of Health Services. Each ambulance can only be registered with one ambulance company. (Ex. 2 at ¶ 19). PMT and ComTrans are separate entities with separate business purposes, operations, and customers, with some common ownership. (Ex. 2 at ¶ 20).

## III.    LEGAL ARGUMENT

### A.    Alter Ego test

When the General Counsel alleges that an entity is the alter ego of a respondent, subject to the latter's legal and contractual obligations, the General Counsel has the burden of establishing that status. *Crossroads Electric*, 343 NLRB 1502 (2004), *enfd.* 178 Fed.Appx. 528 (6th Cir. 2006). The Board considers several factors when determining whether alter-ego status

4

has been shown. Specifically, the Board considers whether two entities have substantially identical ownership, management and supervision, business purpose, operation, customers, and equipment. *Fallon-Williams, Inc.*, 336 NLRB 602, 602 (2001)   "The Board also looks to whether the purpose behind the creation of the alleged alter ego was legitimate or whether, instead, its purpose was to evade responsibilities under the Act.'" *Liberty Source W*, 344 NLRB 1127, 1136 (2005) (quoting *Fugazy Continental Corp.*, 265 NLRB 1301, 1302 (1982), enfd. 725 F.2d 1416 (D.C. Cir. 1984)). Here, the General Counsel cannot meet its burden to establish that PMT and ComTrans are alter ego entities.

### B.   General Counsel cannot meet its burden on the elements for alter ego status

#### 1.   *ComTrans is not a 'disguised continuation' of PMT*

Generally, alter ego cases arise, where one entity has disappeared and has been succeeded by another that is indistinguishable from or a "disguised continuance" of  the predecessor. *Advance Electric,* 268 NLRB 1001, 1004 (1984). Indeed, in Paragraph 2(h) of the Complaint, the General Counsel alleges that PMT established ComTrans in March 2008 as a disguised continuation of PMT.  As outlined above, ComTrans is not a "disguised continuation" of PMT. In fact, ComTrans has been in existence, in some form, since 1985. (Ex. 1). PMT's owner, Bob Ramsey, has owned ComTrans since before he obtained ownership of PMT. (Ex. 2). Accordingly, it is also not possible that ComTrans was established in 2008 as alleged.

There are no facts under which the General Counsel can show that PMT established ComTrans in March 2008 as a "disguised continuation" of PMT as alleged in Paragraph 2(h) of the Complaint. Respondent is thus entitled to judgment in its favor on the allegations in Paragraph 2(h) of the Complaint.

5

### 2. *ComTrans was not created for an improper purpose*

The Complaint also alleges that ComTrans was established for the purposes of evading PMT's responsibilities under the Act. (Complaint at ¶ 2(i)). This allegation is without merit. Courts and the Board have held that "unlawful motive or intent are critical inquiries in an alter ego analysis...." *Int'l Union of Operating Engineers v. Centor Contractors,* 831 F.2d 1309, 1312 (7th Cir.1987). Again the Board looks to 'whether the purpose behind the creation of the alleged alter ego was legitimate or whether, instead, its purpose was to evade responsibilities under the Act.'" *Liberty Source W,* 344 NLRB 1127, 1136 (2005); *See also, Carpenters Local 1478 v. Stevens,* 743 F.2d 1271 (9th Cir. 1984)(holding that unlawful motive exists whether there is an attempt to avoid the obligations of a collective bargaining relationship through a sham transaction or merely a "technical change" in operations).

Here, it is temporally impossible that PMT or its owners established ComTrans in order to avoid PMT's obligations under the National Labor Relations Act. Again, PMT's owner owned ComTrans prior to owning PMT. Further, the Union was not in existence until 2006. (See Ex. 2 at ¶ 21). ComTrans was started in 1985 and acquired by Bob Ramsey in May 2003. (See Ex. 2 at ¶ 2). Accordingly, there are no facts under which the General Counsel can establish that PMT created ComTrans for the improper purpose of avoiding its bargaining or other obligations under the Act. Respondent is entitled to judgment in its favor on the allegations in Paragraph 2(i) of the Complaint.

### 3. *The other single employer factors are not met*

As outlined above, in an alter ego analysis, the Board considers whether two entities have substantially identical ownership, management and supervision, business purpose, operation, customers, and equipment. *Fallon-Williams, Inc.*, 336 NLRB 602, 602 (2001). Here, although

6

ComTrans and PMT share some common ownership, the General Counsel cannot establish that the remaining factors required for alter ego status are met.

Initially, PMT and ComTrans have separate management and supervision. PMT's managers are not ComTrans's managers and vice versa. Further, the entities have a separate business purpose. PMT services 911 and inter-facility calls. ComTrans is limited to behavioral health calls and is prohibited by its Certificate of Necessity from servicing 911 calls. PMT's and ComTrans's operations are separately located in separate cities with little, if any, overlap. Additionally, the two entities serve different customers. PMT contracts with several municipalities in the Phoenix area. ComTrans's primary customers are two behavioral health centers. (See Ex. 2).

Finally, it is noteworthy that ComTrans is paid significantly less for transports than PMT is. (Ex. 2 at ¶ 14). Ambulance services in the State of Arizona may charge only those rates approved by the Arizona Department of Health Services. ComTrans's rates are: Advanced Life Support ("ALS") Base Rate $636.11, Basic Life Support ("BLS") Base Rate $566.32, Mileage $14.32 per loaded mile. PMT rates are: ALS Base Rate $710.57, BLS Base Rate $632.96, Mileage $14.73. Each company may charge the manufacturer's suggested retail price for supplies. Assuming a fairly typical transport of an ALS patient with $100 in disposable supplies transported 7 miles, the resulting bill for ComTrans would be $836.35. If the same transport occurred with PMT the resulting bill would be $913.68. Therefore, diverting a call from PMT to ComTrans would result in a loss of $77.33 or 8.5% in this hypothetical scenario. (Ex. 2 at ¶ 14). Accordingly, it would not make business or financial sense for PMT to divert calls to ComTrans. As these facts make clear, PMT and ComTrans are not alter egos.

7

Because the remaining factors for alter ego status are also not met, PMT is entitled to judgment in its favor on all elements of the Complaint requiring alter ego status, including, but not limited to, Paragraphs 2(i), 2(h), 2(j), and 7(a) of the Complaint.

## IV.    CONCLUSION

As outlined above, there are no facts under which General Counsel can establish that PMT and ComTrans are "alter ego" companies. Accordingly, for all of the foregoing reasons, Respondent is entitled to judgment as a matter of law and the allegations in the Complaint that require alter ego status should be dismissed without a hearing before an administrative law judge.  Further, Respondent ComTrans Ambulance Service, Inc. should be dismissed from the case. By asserting only the grounds set forth in this Motion, Respondent does waive any of its substantive defenses to the Complaint or any other basis for summary dismissal of this matter.

DATED this 28th day of May, 2010.

SHERMAN & HOWARD L.L.C.

/s/ Michael C. Grubbs
Robert J. Deeny
Thomas J. Kennedy
Michael C. Grubbs
2800 N. Central Avenue, Suite 1100
Phoenix, AZ 85004
Attorneys for Professional Medical
Transport, Inc.

8

I certify that I caused a copy of the foregoing
Motion for Partial Summary Judgment to be
electronically filed this 28th day of May, 2010,
and that a

*COPY* of the foregoing was sent via
email this 28th day of May, 2010, to:

Cornele A. Overstreet
Regional Director, Region 28
NATIONAL LABOR RELATIONS BOARD
2600 N. Central Avenue, Suite 1800
Phoenix, AZ  85004-3099
cornele.overstreet@nlrb.gov

Sandra L. Lyons
Field Attorney, Region 28
NATIONAL LABOR RELATIONS BOARD
2600 N. Central Avenue, Suite 1800
Phoenix, AZ  85004-3099
Sandra.Lyons@nlrb.gov

Joshua S. Barkley
Independent Certified Emergency
Professionals of Arizona, Local #1
11417 E. Decatur Street
Mesa, AZ  85207
coachjbar@yahoo.com

Daniel S. Riley
Curry, Pearson & Wooten, PLC
814 West Roosevelt
Phoenix, Arizona 85007
driley@azlaw.com


By /s/ Tisha A. Davis _____

9

Exhibit 1



# ARIZONA DEPARTMENT OF HEALTH SERVICES

*Division of Emergency Medical Services
and Health Care Facilities*

**BRUCE BABBITT, Governor**
**LLOYD NOVICK, M.D., Director**

April 29, 1985

James Garner, President
Terros, Inc. dba
TERROS AMBULANCE SERVICE
4545 North 27th Avenue
Phoenix, Arizona 85017

Dear Mr. Garner:

Congratulations.  Attached is the original and one copy of your initial Certificate of Necessity signed by the Director of Arizona Department of Health Services granting you authority to operate an ambulance service in this state, subject to the provisions contained in the Decision and your Certificate of Necessity.

Please post your Certificate of Necessity, or a copy thereof, in a conspicuous place in your Central Operations Station and any approved Sub-Operations Station.  As your initial Certificate of Necessity is only valid for one year and will expire on April 30, 1986, you will need to file a renewal application with our Office a minimum of sixty days prior to the expiration date of your initial Certificate of Necessity.

As rates and charges have been approved for providing ambulance and ambulance service to the public, we are attaching a copy of your Ambulance Service Schedule (No. One).  This Schedule in conjunction with the Rules and Regulations is to be used in applying any approved rates and charges.  The Schedule shall be available for public inspection at all times during normal office hours at your Central Operations Station and any Sub-Operations Station.

To insure that you are fully aware of the provisions to operate ambulances and an ambulance service in this state, we are attaching a copy of our permanent rules published by the Office of the Secretary of State and a copy of applicable statutes (A.R.S. Sections 36-2201 to 36-2219 and Sections 36-2231 to 36-2244).  We suggest that you and other management personnel become thoroughly familiar with the provisions of these two key documents in order to assure full compliance in any matter or action relating to or affecting your ambulance service.

Sincerely,

PETER C. FRANKLIN, Chief
Office of Ambulance Licensing
and Certification

PCF:RVN:jo
Attachments (4)
1. Certificate of Necessity,
   Certificate No. -46-, Docket No. D-130-85 (EMS 1058).
2. Ambulance Service Schedule No. One
3. A.C.R.R. Title 9, Chapter 13.
4. A.R.S., Sections 36-2201 to 36-2219 and
   Sections 36-2231 to 36-2244.

*The Department of Health Services is An Equal Opportunity Affirmative Action Employer. All qualified men and women, including the handicapped, are encouraged to participate.*

Birch Hall                    411 North 24th Street                    Phoenix, Arizona 85008

1          BEFORE THE DIRECTOR OF THE

2      ARIZONA DEPARTMENT OF HEALTH SERVICES

3

4  In the Matter of:                    )
                                        )   2001A-EMS-0001-DHS
5  Terros Ambulance Service, Inc.       )
   Transferor                           )   DECISION
6                                       )
   and                                  )
7                                       )
   ComTrans Ambulance Service, Inc.     )
8  Transferee                           )
                                        )
9          Applicants.                  )
                                        )
10 ─────────────────────────────────────

11         **PURSUANT TO** the authority granted to me by A.R.S. §41-1092.08(H), and in accordance with

12 the above-referenced appeal, and

13         **IN CONSIDERATION OF** the record of this proceeding, and the recommended decision of

14 the administrative law judge, Dorinda Lang, I hereby make the following decision:

15         **NOW, THEREFORE,** in that the findings of fact, and conclusions of law and recommended

16 decision of the appointed administrative law judge, received on September 14, 2000, and incorporated

17 herein by reference, are supported by the greater weight of credible evidence, and are legally correct,

18 they are hereby **ADOPTED.**

19         **IT IS ORDERED GRANTING** that the transfer of the Terros CON to ComTrans Ambulance

20 Service, Inc. be finalized.

21         **PURSUANT TO** the requirements of A.R.S. §§41-1092.09 and 12-904, the parties are advised

22 that they have a period of thirty (30) days from the receipt of this decision to file a motion for rehearing

23 or review with the Office of Administrative Counsel, at the address appearing on the distribution list;

24 or a period of thirty-five (35) days after receipt of this decision to request judicial review by filing a

25 complaint in Superior Court.

26

27

28

DATED this 20th day of _SEPTEMBER_ , 2000.


Danny Valenzuela
Deputy Director

BEFORE THE DIRECTOR OF THE

ARIZONA DEPARTMENT OF HEALTH SERVICES

RECEIVED
DEC 0 3 2002
BY:

| | |
|---|---|
| In the Matter of: | ) Case No.: 2003A-EMS-0029-DHS |
| | ) |
| ComTrans Ambulance Service, Inc., Transferor, | ) DECISION |
| | ) |
| and | ) |
| | ) |
| American LifeStar, L.L.C., Transferee | ) |
| | ) |
| | ) |

PURSUANT TO the authority granted to me by A. R. S. § 41-1092.08(H), and in accordance with the above-referenced matter, and

IN CONSIDERATION OF the record of this proceeding, and the recommended decision of the administrative law judge, Gary Strickland, I hereby make the following decision,

NOW, THEREFORE, in that the findings of fact, and conclusions of law and recommended decision of the appointed administrative law judge, received on November 13, 2002, and incorporated herein by reference, are supported by the greater weight of credible evidence, and are legally correct, they are hereby ADOPTED.

IT IS HEREBY ORDERED THAT the transfer of the Certificate of Necessity from ComTrans Ambulance, Inc. to American LifeStar is approved and a Certificate of Necessity is to be issued to American LifeStar.

PURSUANT TO the requirements of Arizona Revised Statutes 41-1092.09 and 12-904, the parties are advised that they have a period of thirty (30) days from the receipt of this decision to file a motion for rehearing or review with the Office of Administrative Counsel, at the address appearing on the distribution list; or a period of thirty-five (35) days after receipt of this decision to request judicial review by filing a complaint in Superior Court.

1    Dated this 26ᵗʰ day of November 2002

2

3

4    Danny Valenzuela
     Deputy Director

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 2

AFFIDAVIT

State of Arizona      )
                      )      ss.
County of Maricopa    )

My name is JIM ROEDER and I am the Vice President of Clinical Services for Professional Medical Transport. Inc. I am also a contracted Compliance Manager for ComTrans:

1.  This statement is provided in support of the Motion for Summary Judgment filed in NLRB Case Nos. 28-CA-22747, 28-CA-22801, 28-CA-22993, and 28-CA-23022. PMT and ComTrans are both named Respondents in the NLRB Complaint relating to the above-referenced matters.

2.  ComTrans was granted its first Certificate of Necessity under the name Terros Ambulance Service on April 30. 1985. Its ownership was transferred and its name changed to ComTrans Ambulance Service on September 20, 2000.  ComTrans' ownership was then transferred to the current owner, StarWest, which is owned by Bob Ramsey. on May 23, 2003.

3.  ComTrans has been in existence and under the same ownership since May 2003. PMT, on the other hand, has been owned by Bob Ramsey and Pat Cantelme since August 2005.

4.  ComTrans's operations managers are as follows:

    - Ralph Vassallo      Chief Executive Officer

    PMT's operations managers are as follows:

    - Pat Cantelme      Chief   Executive   officer/911   Operations
      Manager

    - Beverly Lemoine      911 City Manager

    - Barbie Marr      911 City Manager

    - Gary Ramsey      Senior Vice President

    - Kellie O'Connor      Director of Quality Assurance/Staffing

    - Jim Roeder      Vice president of Clinical Services

5.  ComTrans's service area consists of all of Maricopa County.

6. PMT's service area consists generally of Maricopa County east of Peoria's western city limits and south of Phoenix northern city limits.

7. ComTrans Certificate of Necessity (C.O.N.) is limited to behavioral health situations. ComTrans is excluded from 911 contracts by its C.O.N.

8. PMT has an unlimited Certificate of Necessity. PMT is able to do both 911 calls and inter-facility transfers.

9. PMT has 911 contracts with Scottsdale, Paradise Valley, Tempe, Chandler, and Guadalupe.

10. ComTrans's primary customers are Hospice of the Valley and Behavioral Health Crisis Center.

11. PMT has multiple inter-facility contracts, including Banner Health and Catholic Healthcare West. PMT does not contract with Hospice of the Valley or Behavioral Health Crisis Center.

12. ComTrans has unique medicare and Arizona Health Care Cost Containment System (AHCCCS) provider numbers. PMT also has unique medicare and AHCCCS provider numbers which are different than those held by ComTrans.

13. PMT is a member of the Phoenix Uniform Rate Group under the Arizona Department of Health Services regulated rate system. This rate group is made up of all the unrestricted C.O.N. holders in the metropolitan Phoenix area and all have the same rate structure. ComTrans has a restricted C.O.N. and therefore is not allowed to be a part of this rate group. As a result, the Arizona Department of Health Services approved rates that ComTrans is allowed to charge are different and less than those of the Phoenix Uniform Rate Group.

14. ComTrans's rates are: Advanced Life Support ("ALS") Base Rate $636.11, Basic Life Support ("BLS") Base Rate $566.32, Mileage $14.32 per loaded mile. PMT rates are: ALS Base Rate $710.57, BLS Base Rate $632.96, Mileage $14.73. Each company may charge the manufacturer's suggested retail price for supplies. Assuming a fairly typical transport of an ALS patient with $100 in disposable supplies transported 7 miles, the resulting bill for ComTrans would be $836.35. If the same transport occurred with PMT the resulting bill would be $913.68. Therefore, diverting a call from PMT to ComTrans would result in a loss of $77.33 or 8.5% in this hypothetical scenario. ComTrans is paid significantly less for its transports than PMT is for its transports.

15. ComTrans's operational headquarters are at 5424 S. 40th Street in Phoenix, Arizona.

16. PMT's operational headquarters are located at 2495 S. Industrial Park Avenue in Tempe, Arizona.

2

17. ComTrans uses only contract employees for its operations. ComTrans has contracted with ComTrans, Inc., Lifestar EMS, and PMT.

18. PMT has direct employees and staffs most of its positions with full-time employees.

19. The equipment used by PMT and ComTrans is separate. While both ComTrans and PMT use ambulances to deliver the services they provide, each ambulance is, by statute, required to be registered with the Arizona Department of Health Services. Each ambulance can only be registered with one ambulance company.

20. PMT and ComTrans are separate entities with separate business purposes, operations, and customers, with some common ownership.

21. The first time PMT dealt with the Independent Certified Emergency Professionals of Arizona was in 2006, soon after the Union was formed.

The above represents an outline of my knowledge of the matter.

DATED this **27ᵗʰ** day of _May_, 2010

_Jim Roeder_
Jim Roeder

I hereby certify that the foregoing Affidavit was subscribed and sworn to before me this **27ᵗʰ** day of _May_, 2010, by .

Witness my hand and official seal.

GINA INORIO
Notary Public - Arizona
Maricopa County
My Comm. Expires Jul 12, 2010

[SEAL]

_Notary Public_

My Commission Expires: **7/12/10**

3

PHOENIX \ 709702.1 \ 087465.002

**EXHIBIT D**

SHERMAN & HOWARD

MAY 0 3 2010

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 28

PROFESSIONAL MEDICAL
TRANSPORT, INC.

     **and**                          Cases  28-CA-22747
                                             28-CA-22801
                                           28-CA-22993

PROFESSIONAL MEDICAL
TRANSPORT, INC.  and its alter ego
AMERICAN COMTRANS AMBULANCE
SERVICE, INC.

     **and**                          Case   28-CA-23022

INDEPENDENT CERTIFIED EMERGENCY
PROFESSIONALS OF ARIZONA, LOCAL #1

ORDER FURTHER CONSOLIDATING CASES,
SECOND CONSOLIDATED COMPLAINT AND NOTICE OF HEARING

Upon charges filed on October 21, 2009, and December 4, 2009, by the

Independent Certified Emergency Professionals of Arizona, Local #1, herein called the

Union, a Order Consolidating Cases, Consolidated Complaint and Notice of Hearing issued in

Cases 28-CA-22747 and 28-CA-22801 on January 29, 2010, against Professional Medical

Transport, Inc., herein called the Respondent PMT, and the Union in Case 28-CA-22993 has

charged that the Respondent PMT, and in Case 28-CA-23022 that the Respondent PMT and

its alter ego, American Comtrans Ambulance Service, Inc., herein called Respondent

Comtrans, and herein collectively called the Respondents, have been engaging in unfair labor

practices as set forth in the National Labor Relations Act, 29 U.S.C. § 151 et seq., herein

called the Act.  Based thereon, and in order to avoid unnecessary costs or delay, the General

Counsel, by the undersigned, pursuant to Section 102.33 of the Rules and Regulations of the

National Labor Relations Board, herein called the Board, **ORDERS** that these cases are further consolidated.

These cases having been further consolidated, the General Counsel, by the undersigned, pursuant to Section 10(b) of the Act and Sections 102.15 and 102.17 of the Board's Rules and Regulations, issues this Order Further Consolidating Cases, Second Consolidated Complaint and Notice of Hearing and alleges as follows:

1.    (a)    The charge in Case 28-CA-22747 was filed by the Union on October 21, 2009, and a copy was served by regular mail on the Respondent PMT on October 22, 2009.

(b)    The charge in Case 28-CA-22801 was filed by the Union on December 4, 2009, and a copy was served by regular mail on the Respondent PMT on that same date.

(c)    The charge in Case 28-CA-22993 was filed by the Union on April 9, 2010, and a copy was served by regular mail on the Respondent PMT on that same date.

(d)    The amended charge in Case 28-CA-22993 was filed by the Union on April 26, 2010, and a copy was served by regular mail on the Respondent PMT on April 27, 2010.

(e)    The charge in Case 28-CA-23022 was filed by the Union on April 30, 2010, and a copy was served by regular mail on the Respondents on the same date.

2.    (a)    At all material times the Respondent PMT, an Arizona corporation, with an office and place of business in Tempe, Arizona, herein called the

Respondent PMT's facility, has been engaged in providing emergency transportation and medical care.

(b)     During the 12-month period ending October 21, 2009, the Respondent PMT, in conducting its business operations described above in paragraph 2(a), purchased and received at the Respondent PMT's facility goods valued in excess of $50,000 directly from points outside the State of Arizona.

(c)     At all material times the Respondent PMT has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

(d)     At all material times the Respondent Comtrans, an Arizona corporation, with an office and place of business in Tempe, Arizona, herein called the Respondent Comtrans' facility, has been engaged in providing emergency transportation and medical care.

(e)     During the 12-month period ending April 30, 2010, the Respondent Comtrans, in conducting its business operations described above in paragraph 2(d), purchased and received at the Respondent Comtrans' facility goods valued in excess of $50,000 directly from points outside the State of Arizona.

(f)     At all material times the Respondent Comtrans has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

(g)     At all material times, the Respondent PMT and the Respondent Comtrans have had substantially identical management, business purpose, operation, equipment, customers, and supervision, as well as ownership.

(h)     In or about March 2008, the Respondent Comtrans was established by the Respondent PMT, as a disguised continuation of the Respondent PMT.

3

(i)     The Respondent PMT established the Respondent Comtrans, as described above in paragraph 2(h), for the purpose of evading its responsibilities under the Act.

(j)     Based on the operations and conduct described above in paragraphs 2(g) through 2(i), the Respondent PMT and the Respondent Comtrans are, and have been at all material times, alter egos within the meaning of the Act.

3.     At all material times the Union has been a labor organization within the meaning of Section 2(5) of the Act.

4.     (a)     At all material times the following individuals held the positions set forth opposite their respective names and have been supervisors of the Respondent PMT within the meaning of Section 2(11) of the Act and agents of the Respondent PMT within the meaning of Section 2(13) of the Act:

| | | |
|---|---|---|
| Bob Ramsey | - | Owner/ President |
| Patrick Cantelme | - | CEO/ 911 Operations Manager |
| Jim Roeder | - | Vice President of Clinical Services |
| Joy Carpenter | - | Human Resources Director |
| Orlando Alcordo | - | Director of Education |
| Kelley O'Connor | - | Director of Quality Assurance/ Staffing |
| Beverly Lemoine | - | 911 Regional Manager |
| Wayne Clonts | - | Director of Employee Services |
| Rick Foster Vinard | - | Quality Assurance Manager |
| Lynn Akin | - | Field Supervisor |
| Jeremy Leonard | - | Field Supervisor |
| Rick (last name unknown) | - | Field Supervisor |

(b)     At all material times the following individuals held the positions set forth opposite their respective names and have been supervisors of the Respondent Comtrans within the meaning of Section 2(11) of the Act and agents of the Respondent Comtrans within the meaning of Section 2(13) of the Act:

4

Bob Ramsey        -   Owner/ President
Gina Inorio       -   Secretary/Treasurer

5.    (a)    The following employees of the Respondent PMT, herein called

the Unit, constitute a unit appropriate for the purposes of collective bargaining within the

meaning of Section 9(b) of the Act:

> All full-time field paramedics, EMTs, IEMT's, and registered nurses,
> but excluding administrative staff individuals, support services,
> personnel not directly operating in the field as an EMS provider,
> guards, office clerical, and supervisors as defined under the Act.

(b)    Since on or about July 7, 2006, and at all material times, the

Union has been the designated exclusive collective-bargaining representative of the Unit and

since then the Union has been recognized as the representative by the Respondent PMT.  This

recognition has been embodied in a recognition agreement dated July 7, 2006.

(c)    At all times since July 7, 2006, based on Section 9(a) of the Act,

the Union has been the exclusive collective-bargaining representative of the Unit.

6.    (a)    Since on or about November 11, 2009, the Respondent PMT

has maintained a policy manual containing the following rule:

> **Buttons and Pins** – In no circumstances will employees be permitted
> to wear or display non regulation buttons, pins or other insignia,
> without prior approval of administration.

(b)    On or about November 18, the Respondent PMT, through

Kelley O'Connor, herein called O'Connor, by e-mail to employees:

(1)    created an impression among its employees that their

Union and other concerted activities were under surveillance by the Respondent PMT;

(2)    promulgated an overly-broad and discriminatory rule

prohibiting its employees from engaging in Union and other concerted activities; and

5

        (3)      threatened its employees with unspecified reprisals for engaging in Union and other concerted activities.

       (c)      On or about November 18, 2009, the Respondent PMT, by Lynn Akin, herein called Akin, at the Respondent's facility, orally promulgated an overly-broad and discriminatory rule prohibiting its employees from presenting concerted complaints to its human resources department.

    7.    (a)      Since in or about November 2009, a more precise date being unknown to the General Counsel, the Respondent PMT has transferred Unit work to the Respondent Comtrans.

       (b)      Since in or about mid-March 2010, the Respondent PMT has imposed onerous and rigorous terms and conditions of employment on its employee Joshua Barkley, herein called Barkley, by requiring Barkley to work extended shifts and failing and refusing to schedule a replacement for Barkley's shift.

       (c)      On or about April 5, 2010, the Respondent PMT discharged its employee Linda Combs, herein called Combs.

       (d)      On or about April 14, 2010, the Respondent PMT discharged its employee Ryan Brockhaus, herein called Brockhaus.

       (e)      The Respondent PMT engaged in the conduct described above in paragraphs 7(a) through 7(d), because the named employees of the Respondent PMT assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

       (f)      The Respondent PMT engaged in the conduct described above in paragraphs 7(b) through 7(d), because the named employees gave testimony to the Board in

6

the form of an affidavit or testified at a hearing before the Board in Cases 28-CA-22175, et. al.

        8.    (a)    Since on or about September 4, 2009, the Union, by e-mail, has requested that the Respondent PMT furnish the Union with contact information for all field personnel, including paramedics, IEMT's, EMT's and Nurses of all levels employed by the Respondent PMT.

        (b)    Since on or about September 9, 2009, the Union, by e-mail, has requested that the Respondent PMT furnish the Union with the following information:

        (1)    pay scale information between the Respondent PMT's full-time and part-time employees;

        (2)    a copy of the Respondent PMT's break policy, meal time policy, down time or exhaustion policy;

        (3)    reports on seven crews that were called into Station One to be written up for lack of radio use, a copy of the policy related to lack of radio use, and a list of the names of employees called in;

        (4)    a copy of the Respondent PMT's two-hour hold policy and Hammer bonus policy; and,

        (5)    a copy of the Respondent PMT's  policy on locking the drug box.

        (c)    Since on or about April 9, 2010, the Union, by e-mail, has requested that the Respondent PMT provide the Union with the following information:

        (1)    A copy of the Respondent PMT's insurance policy under which Brockhaus is uninsurable; and

         (2)     A list of other employees who are uninsurable under the Respondent PMT's insurance policy and a description of any accommodations offered to these employees.

         (d)     Since on or about April 19, 2010, the Union, by e-mail, has requested that the Respondent PMT provide the Union with all documents pertaining to the discharge of its employee Chip Dye, including Global Positioning System times.

         (e)     The information requested by the Union, as described above in paragraphs 8(a) through 8(d), is necessary for, and relevant to, the Union's performance of its duties as the exclusive collective-bargaining representative of the Unit.

         (f)     Since on or about September 4, 2009, the Respondent PMT has failed and refused to furnish the Union with the information requested by it as described above in paragraph 8(a).

         (g)     Since on or about September 9, 2009, the Respondent PMT has failed and refused to furnish the Union with the information requested by it as described above in paragraphs 8(b)(1) through 8(b)(4).

         (h)     During the period from on or about September 9, 2009, to a date in or about December 2009, a more precise date being unknown to the General Counsel, the Respondent PMT delayed in providing the Union with the information requested by it as described above in paragraph 8(b)(5).

         (i)     Since on or about April 9, 2010, the Respondent PMT has failed and refused to furnish the Union with the information requested by it as described above in paragraph 8(c).

(j)      Since on or about April 19, 2010, the Respondent PMT has
failed and refused to furnish the Union with the information requested by it as described
above in paragraph 8(d).

(k)      In or about mid-August 2009, a more precise date being
unknown to the General Counsel, the Respondent PMT:

(1)      installed surveillance cameras on the vehicles used by
Unit employees;

(2)      changed its policy regarding down time for its
employees during 24-hour shifts; and

(3)      changed its policy regarding public relations visits by its
employees.

(l)      In or about September 2009, a more precise date being
unknown to the General Counsel, the Respondent PMT shut down its crew M403 and
transferred such employees to other crews and stations.

(m)      Since in or about November 2009, a more precise date being
unknown to the General Counsel, the Respondent PMT has transferred Unit work to the
Respondent Comtrans.

(n)      In or about February 2010, a more precise date being unknown
to the General Counsel, the Respondent PMT submitted a bid to the City of Peoria, Arizona,
that would require the Respondent PMT to transfer Unit work to non-Unit employees.

(o)      On or about April 5, 2010, the Respondent PMT filled a Unit
position without first posting a notice of vacancy at its facilities.

9

(p)     The Respondent PMT engaged in the conduct described above in paragraphs 8(k) through 8(o) without prior notice to the Union and without affording the Union an opportunity to bargain with the Respondent with respect to this conduct and the effects of this conduct.

(q)     The subjects set forth above in paragraphs 8(k) through 8(o) relate to wages, hours, and other terms and conditions of employment of the Unit and are mandatory subjects for the purpose of collective bargaining.

9.     (a)     At various times since April 21, 2009, the Union sought to meet or met with the Respondent PMT for the purpose of collective bargaining with respect to wages, hours, and other terms and conditions of employment of the employees in the Unit.

(b)     During the period described above in paragraph 9(a), the Respondent PMT engaged in the following conduct:

(1)     dilatory tactics;

(2)     refused to confer at reasonable times and intervals;

(3)     refused to provide relevant and necessary information to the Union upon the Union's request; and

(4)     engaged in unilateral action that modified its employees' wages, hours, and working conditions, or other mandatory subjects of bargaining; and

(5)     transferred Unit work to non-Unit employees.

(c)     By its overall conduct, including the conduct described above in paragraphs 7 through 9, the Respondent PMT has failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the Unit.

10

10.     By the conduct described above in paragraph 6, the Respondent PMT has been interfering with, restraining, and coercing employees in the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

11.     By the conduct described above in paragraphs 7(a) through 7(e), the Respondent has been discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization in violation of Section 8(a)(1) and (3) of the Act.

12.     By the conduct described above in paragraphs 7(b) through 7(d) and 7(g), the Respondent PMT has been discriminating against employees for filing charges or giving testimony under the Act in violation of Section 8(a)(1) and (4) of the Act.

13.     By the conduct described above in paragraphs 8 and 9, the Respondent PMT has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees in violation of Section 8(a)(1) and (5) of the Act.

14.     The unfair labor practices of the Respondents described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

WHEREFORE, as part of the remedy for the unfair labor practices alleged above in paragraphs 6 through 13, the General Counsel seeks an Order requiring that the Respondent, beyond any standard notice-posting remedy ordered by the administrative law judge, the Board, and any Circuit Court of Appeals enforcing the Board's order, send to its employees the Board's Notice to Employees in or as an attachment to an electronic mail message in the same manner as the Respondent sends announcements and other messages to employees.  The General Counsel further seeks an order requiring that the Respondent pay

interest on any back pay or other monetary awards on a compounded, quarterly basis. The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## ANSWER REQUIREMENT

The Respondents are notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations; it must file an answer to the complaint. **The answer must be received by this office on or before May 14, 2010, or postmarked on or before May 13, 2010.** Unless filed electronically in a pdf format, Respondent should file an original and four copies of the answer with this office.

An answer may also be filed electronically by using the E-Filing system on the Agency's website. In order to file an answer electronically, access the Agency's website at http://www.nlrb.gov, click on the **E-Gov tab**, select **E-Filing**, and then follow the detailed instructions. The responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the document need to be transmitted to the Regional Office. However, if the electronic version of an answer to a

complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.

Service of the answer on each of the other parties must be accomplished in conformance with the requirements of Section 102.114 of the Board's Rules and Regulations. The answer may not be filed by facsimile transmission.  If no answer is filed or if an answer is filed untimely, the Board may find, pursuant to Motion for Default Judgment, that the allegations in the complaint are true.

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that on May 17, 2010, at 1:00 p.m. (local time), in he hearing room, National Labor Relations Board, 2600 North Central Avenue, Suite 1800, Phoenix, Arizona, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.  At the hearing, the Respondents and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated at Phoenix, Arizona, this 30th day of April 2010.

Cornele A. Overstreet, Regional Director

Attachments

13

Form NLRB-4338
(6-90)

# UNITED STATES GOVERNMENT
# NATIONAL LABOR RELATIONS BOARD

## NOTICE

Cases:   28-CA-22747
28-CA-22801
28-CA-22993
28-CA-23022

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end. An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.

However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements *will not be granted* unless good and sufficient grounds are shown *and* the following requirements are met:

(1)   The request must be in writing. An original and two (2) copies must be filed the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2)   Grounds must be set forth in *detail*;

(3)   Alternative dates for any rescheduled hearing must be given;

(4)   The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; *and*

(5)   Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three (3) days immediately preceding the date of hearing.

Professional Medical Transport, Inc.
2495 Industrial Park Avenue
Tempe, AZ 85282

Robert J. Deeny, Attorney at Law
Sherman & Howard L.L.C.
2800 North Central Avenue, Suite 1100
Phoenix, AZ 85004

Independent Certified Emergency
Professionals of Arizona, Local #1
11417 East Decatur Street
Mesa, AZ 85207

American ComTrans Ambulance, Inc.
1501 W. Fountainhead Parkway, Suite 650
Tempe, AZ  85282

**EXHIBIT E**

**11778 Service of Subpoenas**

Sec. 102.113(c), Rules and Regulations requires that subpoenas be served personally, by registered or certified mail, by telegraph, or by delivery at the principal office or business address of the person being served. Also see Sec. 11(4) of the Act. Absent unusual circumstances, such service should be by certified mail or hand delivery with a copy served by regular mail, hand delivery, or by facsimile on any attorney or other representative of the party or witness. If a party or witness is represented by more than one attorney or representative, service on any one of such persons, in addition to the party or witness, satisfies this requirement. However, as a matter of courtesy, an effort should be made to serve all attorneys or representatives of a party or a witness. See Secs. 11842.2–.3 and Sec. 102.113(f), Rules and Regulations.

***

**11842.2 Service of Other Formal Documents** Complaints, compliance specifications, amendments to either, notices of hearing in C cases, final Board Orders, Administrative Law Judge decisions, and subpoenas must  be served personally, by registered or certified mail, by telegraph, or by leaving a copy at the principal office or place of business of the person on whom service is sought. Sec. 102.113(a)–(c), Rules and Regulations.

To establish necessary proof of service, return receipts must be requested when complaints, compliance specifications, and amendments thereto are served on respondents by certified mail. Subpoenas served by certified mail should also require a return receipt. Although return receipts are a practical necessity in the above circum-stances, the rules do not require that return receipts be obtained. Accordingly, to save expense, return receipts should not be requested for certified mail delivery of complaints, compliance specifications, and amendments thereto to charging parties, parties to the contract, and parties of interest. Attorneys or representatives should be served by regular mail. Other documents may be served by any of the foregoing methods, as well as by regular mail or private delivery service, or, with the permission of the person receiving service, by facsimile transmission. Sec. 102.113(d), Rules and Regulations.

Note: If a party or person is represented by an attorney, the instructions regarding service set forth in Sec. 11842.3 should also be followed. On the other hand, if a party or person is

represented by a nonattorney designated representative, the instructions regarding service set forth in Sec. 11842.4 should be followed.

***

**11770.3 Notification to Attorney or Representative** When serving a subpoena on a witness represented by an attorney, restrictions against skipping counsel mandate that the attorney receive notification of the subpoena. See Sec. 10058. However, there is no requirement that an attorney representative of a party be notified of a subpoena to a witness who is not a supervisor or agent of the party.[3]

[3] See generally *S.E.C. v. O'Brien,* 467 U.S. 735 (1984).

**11842.3 Service When a Party or Person is Represented by an Attorney** When a party's or person's representative is an attorney, Model Rule 4.2, the skip counsel rule described in Sec. 10058, regulates the service of all documents and correspondence. Accordingly, all documents and correspondence, regardless of the method of service, should be addressed to and served exclusively on the attorney unless:

***

(a) *Service on Party or Person with Copy to Attorney:* The following documents and/or correspondence should be addressed to and served on the appropriate party(ies) or parties and their attorneys or designated representatives:

***

Subpoenas, related forms and instructions, and standard cover letters which do not convey substantive information or invite a response. However, written communications conveying substantive information or inviting a response which may accompany subpoenas must be addressed to and served exclusively on the attorney unless the attorney has consented to service on the party or person.

***

**EXHIBIT F**

**BEFORE THE**
**NATIONAL LABOR RELATIONS BOARD**
**REGION 28**

In the Matter of:

PROFESSIONAL MEDICAL TRANSPORT, INC.

and

PROFESSIONAL MEDICAL TRANSPORT, INC.,
and its alter ego AMERICAN COMTRANS
AMBULANCE SERVICE, INC.,

and

INDEPENDENT CERTIFIED EMERGENCY
PROFESSIONALS OF ARIZONA, LOCAL #1.

Cases:   28-CA-22747
         28-CA-22801
         28-CA-22993
         28-CA-23022

        The above-entitled matter came on for hearing pursuant to

Notice, before **WILLIAM G. KOCOL, Administrative Law Judge,** at

the National Labor Relations Board, Region 28, 2600 North

Central Avenue, Phoenix, Arizona, on Monday, June 7, 2010.

<u>**A P P E A R A N C E S**</u>

```
 1
 2
 3    On Behalf of Counsel for General Counsel:
 4
 5         SANDRA LYONS, ESQ.
 6         NATIONAL LABOR RELATIONS BOARD - Region 28
 7         2600 North Central Avenue, Suite 1800
 8         Phoenix, Arizona  85004
 9         Phone:     (602) 640-2160
10         Fax:       (602) 640-2178
11
12
13    On Behalf of Professional Medical Transport, Inc.:
14
15         THOMAS J. KENNEDY, ESQ.
16         SHERMAN & HOWARD
17         7047 East Greenway Parkway, Suite 155
18         Scottsdale, Arizona  85254
19         Phone:     (480) 624-2725
20         Fax:       (480) 624-2029
21
22         MICHAEL C. GRUBBS, ESQ.
23         SHERMAN & HOWARD
24         2800 North Central Avenue, Suite 1100
25         Phoenix, Arizona  85004
26         Phone:     (602) 240-3088
27         Fax:       (602) 240-6600
28
29
30    On Behalf of ComTrans:
31
32         DANIEL RILEY, ESQ.
33         CURRY, PEARSON & WOOTEN, PLC
34         814 West Roosevelt Street
35         Phoenix, Arizona  85007
36         Phone:     (602) 258-1000
37         Fax:       (602) 523-9000
38
39
40    On Behalf of Independent Certified Emergency Professionals:
41
42         JOSHUA S. BARKLEY, President
43         11417 East Decatur Street
44         Mesa, Arizona  85207
45
46
47
48
```

1   that approach.

2      JUDGE KOCOL:  That is appropriate.  That is not a for him

3   not --

4      MR. KENNEDY:  And three, the Company is not taking the

5   position that Mr. Ramsey will be totally unavailable.  Rather,

6   I believe we have already reached agreement with -- with the

7   Counsel and the Court, that this would be the opening phase of

8   the hearing, and that there is going to be a later phase in

9   August, and Mr. Ramsey, who is the CEO, he will be certainly

10  available then.

11     JUDGE KOCOL:  When did you learn that Mr. Ramsey had been

12  served with a subpoena?

13     MR. KENNEDY:  The first that I learned of it was --

14     JUDGE KOCOL:  Or anyone in your firm.  I don't want to

15  limit --

16     MR. KENNEDY:  Well, let me speak about what I know best,

17  which is my own knowledge, and it frankly came in a

18  conversation with Ms. Lyons, I think it was last Thursday, when

19  we were -- when we were discussing documents.  I think she had

20  made a reference to questioning Mr. Ramsey and following that

21  conference, I came back and did my own investigative work in

22  order to ascertain -- if that was the case, when was he slated

23  to appear, and so basically, the short answer, Your Honor,

24  without belaboring it was I had reason to believe that he had

25  been subpoenaed on Thursday of last week, and then later

**EXHIBIT G**

## Lyons, Sandra L.

**From:**    Lyons, Sandra L.
**Sent:**    Sunday, June 06, 2010 10:50 AM
**To:**      'Grubbs, Michael '
**Subject:** RE: Documents

Mr. Ramsey is subpoenaed and required to be in attendance.
He was served on April 27, 2010 of his requirement to attend the hearing.

No petition to revoke his subpoena was filed by PMT.  You also agreed to this trial date.

You can tell your client that the Region will seek subpoena enforcement if he fails to show up.

---

**From:** Grubbs, Michael [mailto:mgrubbs@shermanhoward.com]
**Sent:** Sunday, June 06, 2010 10:43 AM
**To:** Lyons, Sandra L.
**Subject:** RE: Documents

Sandi,

We only recently received notice that Mr. Ramsey has been subpoenaed, as we did not receive courtesy copies of the subpoenas. However, I wanted to inform you that, based on our current understanding, Mr. Ramsey will not be attending the hearing due to pre-existing business commitments. As owner of PMT, Mr. Ramsey is not as heavily involved in the day-to-day operations of the company. Thus, in our opinion, his presence is not necessary anyway as others are more knowledgeable about the topics in the complaint. As you may be aware due to the affidavit to PMT's Motion for Summary Judgment, Mr. Roeder is the one familiar with the ComTrans issues. Ms. Carpenter has been most heavily involved in the bargaining aspect of the case. For those same reasons, we do not plan to call Mr. Ramsey in our case either. Hopefully, this will ensure enough notice that you can still prepare for the first witnesses you plan to call.

Mike

---

**From:** Lyons, Sandra L. [mailto:Sandra.Lyons@nlrb.gov]
**Sent:** Saturday, June 05, 2010 1:46 PM
**To:** Grubbs, Michael
**Subject:** RE: Documents

Hi Mike,
With the exception of Vinard, they are all scheduled for Monday, not Wednesday.

I anticipate needing Ramsey first, then Carpenter, then Lemoine.  Ramsey may take all afternoon on Monday, not sure.....but at least those three on Monday....

Therefore, the others don't need to come that day although you can have Cantleme and O'Connor standing by...I seriously doubt I will get to them.

Sandi

---

**From:** Grubbs, Michael [mailto:mgrubbs@shermanhoward.com]
**Sent:** Saturday, June 05, 2010 10:41 AM
**To:** Lyons, Sandra L.

6/7/2010

**Subject:** RE: Documents

Sandi,

Here is the first batch. These, unfortunately, are not the Bates-labeled ones, which you should get Monday morning. I have not carefully reviewed these again, but I think these are all "bargaining" documents - mostly back-and-forth between Josh and Bob and Joy.

Do you know when the supervisors are subpoenaed for? I haven't seen the actual subpoenas, but I thought they were mostly for Wednesday. Is that right? I don't know what days would be best for all, but if you know who you'd like to get to the first day, that might be helpful so we can at least start with the right people there.

Mike

---

**From:** Lyons, Sandra L. [mailto:Sandra.Lyons@nlrb.gov]
**Sent:** Saturday, June 05, 2010 10:25 AM
**To:** Grubbs, Michael
**Subject:** Documents

Hi Mike,
Thank you for the phone call.
If you are able, please pdf the documents.  If you can separate them in some fashion, please do so.  Not sure how much the system can take in one set.
I will then look for the hard copies at 10:00 a.m. on Monday.

Did you want to try to set up a schedule for the supervisor witnesses so they are not sitting around for two days? I certainly cannot get through all of them the first afternoon.

Thanks,
Sandi

6/7/2010